## Lucinda D. THORNTON, et al., Appellants,

v.

## DISTRICT OF COLUMBIA, Appellee.

### No. 91–CV–1251.

District of Columbia Court of Appeals.

Argued April 20, 1993.

Decided Sept. 8, 1994.

Lynn E. Cunningham, Washington, DC, for appellants.

James C. McKay, Jr., Asst. Corp. Counsel, with whom John Payton, Corp. Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corp. Counsel, Washington, DC, were on the brief, for appellee.

Before FARRELL and SULLIVAN, Associate Judges, and MACK, Senior Judge.

FARRELL, Associate Judge:

Three public housing tenants (the tenants) appeal from a decision of the trial court dismissing their civil actions for injunctive and declaratory relief. In their suits, the tenants sought to prevent the District of Columbia Department of Public and Assisted Housing (DPAH) from filing actions for possession against them based partly upon rent owed under leases with DPAH for housing units from which the tenants had been transferred to permit renovation of those units. The dismissal was without prejudice to the tenants' right to raise appropriate claims as defenses to future possessory actions filed against them in the Landlord and Tenant Branch.

---

On appeal, the tenants argue principally that the District of Columbia may not sue for possession of their current units in the Landlord and Tenant Branch on the basis of rent arrearages under leases no longer in effect. As we rejected a similar argument in *District of Columbia v. Suydam*, 591 A.2d 856 (D.C. 1991), we do so here as well.

## I.

The tenants occupy public housing units under a program administered by the District of Columbia government. We summarized aspects of this program of assisted public housing in *Suydam, supra*. Each tenant transferred to her current housing unit to permit renovation of the unit she had previously occupied. In each case the transfer required that a new dwelling lease be issued between the tenant and the Housing Management Administration. 14 DCMR § 6205.8(b) (1991). DPAH later claimed that, by the time of the transfers in question, each tenant was seriously delinquent in rental payments owed under the previous lease. DPAH therefore sued two of the tenants in the Landlord and Tenant Branch seeking possession of the housing units based on nonpayment of rent.[1]

The dwelling leases under which the tenants occupy their current units contain the following provision:

> If this lease is an extension of occupancy by the Tenant under prior lease or leases with the Administration, any such [rental] amount due under the prior lease or leases may be charged and collected as if the same had occurred hereunder.[2]

Moreover, title 14 of the District's public housing regulations related to dwelling leases provides in part:

> 6205.13 Tenants who execute a new dwelling lease as a result of transfer from one (1) unit to another, or as a result of any other requirement for a new lease, shall remain liable for any delinquent rent or other charges relating to the prior lease.

> 6205.14 The HMA [Housing Management Administration] may unilaterally execute a special supplement to the new lease *which assesses the amount due under the old lease against the new lease.* [Emphasis added.]

Despite this contractual and regulatory language which appears to treat arrearages under a former lease as the equivalent of rent due under the present lease ("assesse[d] ... against the new lease"), the tenants contended in their suit that the District lacks authority to sue them for possession of their units based on claims for back rent "unrelated to any claim for possession of a *current* tenancy" (emphasis added). Rather, the tenants argued, while DPAH was free to pursue all monetary claims against them in an action for debt in the Civil Division of the Superior Court, it could base an action for possession only on the tenants' failure to pay rent on the unit currently occupied. In refusing to order injunctive and declaratory relief, the trial judge implicitly rejected this argument.

## II.

This is not the first time we have considered the claim that when the District, as

---

1. The suits alleged that appellant Thornton owed a total of $4,950 in back rent for the period from December 1, 1985 to June 10, 1990 (her transfer to a new unit took place in February 1990); and that appellant Harrington owed a total of $7,867.20 in back rent for the period from January 1, 1986 to July 31, 1989 (her transfer to a new unit had occurred in April 1987). Appellant Matthews, a resident of public housing since 1969, has been transferred several times and is allegedly overdue in her rental payments from several units. While no formal action has been filed against her, DPAH has informed her that unless she pays the outstanding sum, she will be subject to an action for possession in the Landlord and Tenant Branch.

Appellants originally brought this suit on behalf of themselves and all public housing tenants similarly situated. Upon certification of the case as a class action, the parties requested, and were granted, a vacation of the class certification based on a stipulation which provides, *inter alia*, that DPAH (1) will refrain from bringing similar actions pending the outcome of this appeal, and (2) will treat the outcome of this litigation as binding with respect to all similar actions involving public housing tenants.

2. In *Suydam*, we interpreted the phrase "such amount" in this lease to include "past delinquency" in rent payments as well as "underpaid (because undercharged) rent...." 591 A.2d at 860.

landlord administering the public housing program, executes a new lease with a tenant, the earlier tenancy is extinguished under traditional landlord and tenant principles and an action for possession cannot be based on failure to pay rent under the former lease. That was the very issue we considered in *Suydam* with respect to a "new dwelling lease" that was executed—as required by 14 DCMR § 6205.8(a)—after the status of the head of household had changed by separation, *i.e.*, the tenant-husband had left the dwelling. The new lease, which was for the same dwelling, was signed only by the wife as tenant. We rejected the argument that "the District ... forfeit[ed] its right as landlord to seek dispossession of the tenant for nonpayment of rent merely by issuing her a new lease," as required by § 6205.8(a). 591 A.2d at 860. We said that "[b]oth the lease itself"—specifically the provision quoted above treating any arrearage under a prior lease "as if the same had occurred hereunder"—"and, more importantly, the regulatory scheme under which it was issued belie any intent of the parties to nullify the existing tenancy by executing the new agreement." *Id.* (footnote omitted); *see id.* at 859–60.

The tenants would distinguish *Suydam* as involving only formal changes to a tenancy involving *the same dwelling*. They assert that, even in the context of the District's public housing program, we could not have intended a general repudiation of the common law rule that "the making of a new lease operates as a surrender of an older one." *Schwartz v. Brown*, 64 A.2d 298, 299 (D.C. 1949). But the opinion in *Suydam* speaks for itself. The trial court in that case had terminated the District's suit for possession on the authority of *Schwartz*. We began by stating that the court's reliance on the *Schwartz* rule "misconceived the application of that principle to the execution of the new lease in this case under the District's public housing scheme." 591 A.2d at 858. We observed that even under general landlord and tenant principles, " '[t]he intention of the parties is the test,' and not every 'modification in a contract of lease ... constitute[s] a new lease and operate[s] as a surrender.' " *Id.* at

858 (quoting 3A J. GRIMES, THOMPSON ON REAL PROPERTY § 1347, at 657 (1981 Repl.)). We concluded that the parties, by executing the new lease made necessary by a change in the head of household, had intended "a continuation of [the existing tenancy]" rather than a surrender of it. Admittedly, in doing so we pointed out that the lease, "*executed for the same dwelling*, carries forward nearly verbatim the detailed rights and obligations of both landlord and tenant prescribed in the [former] lease." *Id.* at 858–59 (emphasis added). But the italicized clause was not focal to our analysis, whose key feature was "the regulatory background against which the new lease was issued," in particular HMA's mandatory duty to issue a "new dwelling lease," 14 DCMR § 6205.8, whenever either of two events occurred. One, which had occurred in *Suydam*, was a change in the status of the head of household (§ 6205.-8(a)); the other, we pointed out, was "[w]hen a family is transferred from (1) dwelling unit to another" (§ 6205.8(b)). 591 A.2d at 859 & n. 2.[3] In either case, we held that "the purpose of the 'new dwelling lease' requirement is not to terminate an existing tenancy but to continue it on terms consistent with the goals of the public housing program." *Id.* at 859. Indeed, we pointed out that under governing federal law the public housing agency could " '*not* terminate [a] tenancy except for serious or repeated violation of the terms or conditions of the lease or for other good cause.' " *Id.* (quoting 42 U.S.C. § 1437d(*l*)(4) (1988)) (emphasis added by *Suydam* ).

Thus, because the requirement of a new lease was imposed by regulation, we concluded that "it would make no sense to hold that [the tenant] and the District intended a surrender or extinction of the existing tenancy when they signed the [new] lease." It "follows that by executing the new lease [the tenant] *was not relieved of the obligation for past rent as a condition of continuing to occupy the premises.*" *Id.* (emphasis added). We found confirmation of this conclusion, and of the District's right to seek dispossession for failure to pay rent under the former

---

3. Still other changed circumstances, we noted, required only mutual or unilateral "changes" in

the existing lease, not execution of a new one. *Id.* at 859.

lease, both in the lease provision itself which made the arrearage a present obligation "as if the same had occurred [under the new lease]," and in 14 DCMR § 6205.13, which preserves the liability for delinquent rent of tenants who execute a new dwelling lease. *Id.* at 859–60; *see also* 14 DCMR § 6205.14 (District's execution of "a special supplement to the new lease ... assesses the amount due under the old lease against the new lease").[4]

*Suydam* controls this case. Our analysis there permits no distinction—or a different legal result—as between the two classes of tenants who are required to be issued a new dwelling lease. *Suydam* makes clear that a tenancy "under the District's public housing scheme," *id.* at 858, cannot be divorced from the regulations and corresponding lease provisions that govern the program, and that a new lease issued under the regulations differs materially from one executed under common law principles. Although the tenants cite the definition in 14 DCMR § 6099.1 of a "dwelling lease" as "a written agreement ... for the use and occupancy of a *specific dwelling* " (emphasis added), the conclusion they draw from that disregards the plain intent of §§ 6205.13 and 6205.14, and of the corresponding provision in their leases, to treat past rent due "as an obligation carried forward in the present lease, 'as if the [arrearage] had occurred hereunder.' " *Suydam,* 591 A.2d at 860.

### III.

Even if we were free to decide the present issue unconstrained by *Suydam,* the tenants' position cannot be reconciled with the meaning of § 6205.14, which permits HMA to "unilaterally execute a special supplement to the new lease which assesses the amount due under the old lease *against the new lease* " (emphasis added). In plain English, rent owed under the old lease ("delinquent rent")

is now rent due under the new lease; no other meaning of the words makes sense. And for "[n]onpayment of rent due under the lease," HMA may issue a notice to vacate and, if necessary, seek possession by court action. 14 DCMR §§ 6404.4(a), 6404.6. Under the tenants' theory, by contrast, past rent due could not be assessed against fully half of the class of new dwelling leases HMA is required to issue—those necessitated by transfer of tenants from one dwelling to another. The regulation, § 6205.14, would thus be made inoperative in a huge number of its potential applications.[5]

The effects of limiting DPAH to a civil action for damages (or debt due) as a remedy for delinquent rent when a tenant has been transferred are not hard to imagine. It is true that tenants "delinquent in rent payments shall not be eligible for *tenant* initiated transfer." 14 DCMR § 6401.3 (emphasis added). But HMA's "policy" is to transfer tenants on its own initiative "as necessary," for example, to "[a]lleviate conditions of hardship" that are, or may be, "caused by the physical condition[ ] or location of the unit, or property"; or to "[r]ehabilitate the unit or property." 14 DCMR § 6400.1(a), (d). Indeed, HMA *must* ("shall") transfer tenants who *inter alia* are living in units considered uninhabitable by HMA or that are scheduled for rehabilitation or discontinued use as rental property. § 6402.1(b), (c). If the tenants were correct, then in the latter case—where transfer is mandatory—the District would lose its ability to require payment of back rent as a condition of continued occupancy of the new premises. More importantly from the standpoint of tenants, the District would be discouraged from undertaking rehabilitation (in situations short of uninhabitability) where transfer of tenants was required. Faced with loss of the threat

---

4. As promulgated, §§ 6205.13 and 6205.14 were combined in a single section. *See* 33 D.C.Reg. 8009 (Dec. 26, 1986). The sentences were separated into two subsections in the current edition of Title 14 DCMR by the Office of Documents.

5. Moreover, HMA's inability to condition occupancy under the current lease on satisfying past rent obligations would extend beyond delinquent rent to underpaid rent, *i.e.*, rent calculated too

low based on tenant misrepresentation of facts or failure to furnish timely required income verifications. Under 14 DCMR § 6114.1, such underpaid rent may be assessed as a "retroactive rent charge," which—except upon appellants' theory—survives the tenant's transfer under a new lease as "delinquent rent or other charges" (§ 6205.13) "assessed[d] ... against the new lease." § 6205.14.

of suit for possession as a means to induce payment of back rent, DPAH could well decide that the risks of transferring at least some tenants dictate hesitation in pursuing major renovative efforts. Further, as these cases demonstrate, note 1, *supra*, the District appears to exercise considerable forbearance in asserting its right to seek eviction of public housing tenants for nonpayment of rent. That restraint, whether wise or not, may well be reconsidered if the unforeseen necessity of a tenant transfer means that the agency loses its ability to seek dispossession based on delinquency under the former lease.

In sum, the tenants' argument is contrary to controlling precedent announced by this court only two years ago in *Suydam;* it is incompatible with regulations governing the District's public housing program; and it may disserve the class of tenants as a whole who benefit from the program.[6]

*Affirmed.*

SULLIVAN, Associate Judge, concurring:

In view of our decision in *District of Columbia v. Suydam,* 591 A.2d 856 (D.C.1991), I am constrained to join the majority opinion. *M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C.1971) (no division of this court can overrule a prior decision of this court).

MACK, Senior Judge, concurring:

For the reason stated by Judge Sullivan, I concur in the disposition of this case. I would add, however, that the District is free to pursue all monetary claims against the tenants in the Civil or Small Claims Divisions of the Superior Court and that the summary nature of possessory proceedings in the Landlord and Tenant Branch makes it ill suited for collecting arrearages on the units vacated (at the instance of the District).

---

6. We find no merit in the tenants' additional contention that the Brooke Amendment, 42 U.S.C. 1437a(a)(1) (1988), bars DPAH's suit to enforce their rental obligations carried forward into the new leases.